Mark A. Nadeau, Esq. (SBN 011280)
mark.nadeau@dlapiper.com
Allison L. Kierman, Esq. (SBN 024414)
allison.kierman@dlapiper.com
DLA PIPER LLP (US)
2525 East Camelback Road, Suite 1000
Phoenix, Arizona 85016-4245
Tel: (480) 606-5100
Fax: (480) 505-5101

C. Kevin Kobbe, Esq. (admitted *pro hac vice*)
kevin.kobbe@dlapiper.com
DLA PIPER US LLP (US)
The Marbury Building
6225 Smith Avenue
Baltimore, Maryland 21209
Tel: (410) 580-3000
Fax: (410) 580-3001

Attorneys for Intersections Inc. and Net Enforcers, Inc.

THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br>Joseph Charles Loomis,<br>      Debtor.<br><br>Intersections Inc. and Net Enforcers, Inc.<br>      Movants,<br>v.<br>Joseph C. Loomis,<br>      Respondent. | Case No. 2:10-bk-01885-RJH<br><br>Chapter 11<br><br>**MOTION OF INTERSECTIONS INC. AND NET ENFORCERS, INC. FOR ORDER GRANTING LIMITED RELIEF FROM AUTOMATIC STAY**<br><br>Assigned to the Honorable Randolph J. Haines |

Pursuant to 11 U.S.C. §§ 105 and 362, and Federal Rules of Bankruptcy Procedure 4001, 9013 and 9014, Intersections Inc. ("Intersections") and Net Enforcers, Inc. ("NEI" and, together with Intersections, "Movants"), by their undersigned counsel, hereby move

for relief from the automatic stay imposed by 11 U.S.C. § 362 to permit Movants to continue to prosecute litigation currently pending in the United States District Court for the Eastern District of Virginia against Joseph C. Loomis (the "Debtor") for the limited purpose of seeking a declaration as to the enforceability of the Settlement (as defined below) to which Movants, the Debtor, and his sister, co-defendant Jenni Loomis, agreed just twelve days before the Debtor filed for bankruptcy protection. As set forth more fully below, cause exists to modify the automatic stay to permit the continued prosecution of the litigation for that limited purpose.

This Motion is supported by the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

### Jurisdiction and Background Regarding Bankruptcy Proceedings

1. This Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. § 362.

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

3. On January 26, 2010, the Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.

### Factual Background

4. Intersections and NEI filed suit against the Debtor and his sister, Jenni Loomis, on May 27, 2009 in the United States District Court for the Eastern District of Virginia, in an action styled *Intersections Inc. and Net Enforcers, Inc. v. Joseph C. Loomis and Jenni M. Loomis*, Case No. 1:09CV597 (LMB/TCB) (the "Virginia Litigation").

5. The Virginia Litigation arose out of the Debtor's sale of all of the stock of his company, NEI, to Intersections in November 2007 and his subsequent employment by NEI as its Chief Executive Officer.

**The NEI Acquisition**

6. In January 2007, the Debtor, the president and one of the founders of NEI, hired an investment banker to secure venture capital funding or a buyer for NEI.

7. Soon thereafter, the Debtor and Jenni Loomis began "cleaning up" NEI's books to make the company appear more profitable than it was. They also began overbilling two of NEI's top customers in an effort to boost revenues to ensure a bigger payout.

8. The Debtor's investment banker contacted Intersections in March 2007 regarding acquiring NEI. Intersections and the Debtor then entered into discussions, and Intersections began conducting a due diligence review of NEI's business and financial condition.

9. As part of the due diligence, the Debtor and Jenni Loomis prepared and provided Intersections with company financials and customer data, but concealed the fact that: (1) the financials had been cleaned up and were false, (2) four of the customers they identified as NEI's top 20 customers had cancelled their contracts, and (3) the Debtor and Jenni Loomis were intentionally and systematically overbilling the purported top two customers to make NEI appear more profitable.

10. Unaware of the Debtor's and Jenni Loomis' fraud and deceit, Intersections entered into a Stock Purchase Agreement (the "SPA") with the Debtor and NEI on November 9, 2007.

11. The Debtor represented and warranted in the SPA that the financials he and his sister provided and upon which the purchase price was in large part based were complete and correct.

12. The Debtor also represented that the report he and his sister provided Intersections, and which was attached to the SPA as a schedule, accurately identified both NEI's top 20 customers as of the date the deal closed and the revenue generated by each between July 2006 and June 2007.

13. The Debtor knew that these representations were material to Intersections and that they were false.[1] In reliance on these representations, Intersections agreed to pay the Debtor $14 million in cash, $3.5 million in stock options, and up to $3.5 million in earnout payments. The deal closed on November 30, 2007, and Intersections paid the Debtor $14 million in cash.

**The Debtor's Employment by NEI**

14. NEI also entered into a three-year written Employment Agreement with the Debtor on November 30, 2007. NEI hired the Debtor to be its Chief Executive Officer and to continue to grow the company. NEI agreed to pay the Debtor an annual salary of

---

[1] In an effort to hide his deceit, the Debtor requested that Intersections not contact any of NEI's customers until after executing the SPA, purportedly for confidentiality reasons. The Debtor agreed instead to represent and warrant in the SPA that at no time since December 31, 2006 had any of those top 20 customers (1) terminated its contract with NEI or (2) notified him or NEI of its intent to terminate its contract or materially reduce its purchases, even though he knew the representation was false.

-4-

$250,000. The Debtor agreed to "devote his entire working time to the business of the Corporation" and not to:

> …engage in any other business activities or hold any office or position, regardless of whether any such activity, office or position is pursued for profit or other pecuniary advantage, without the prior written consent of the Parent...[with the exception of] (i) personal investment activities for himself and his family and (ii) charitable and civic activities, so long as such outside interests set forth in subsections (i) and (ii) hereof do not interfere with the performance of his duties and responsibilities hereunder.

15. Shortly thereafter, problems began to arise with the Debtor's employment. The Debtor refused to work within the structure of a public corporation. Intersections made great efforts to work with the Debtor and to assimilate him into the corporate environment and structure, but the Debtor was unwilling to fully cooperate.

16. The Debtor admits that the arrangement was not working and that he quickly became bored with NEI and turned his attention to Loomis Enterprises, LLC ("LE"), a new business venture he had started with his brother, Christopher Loomis, just before the acquisition without Intersections' knowledge.[2]

17. The Debtor continued to collect a sizeable paycheck from NEI, but unbeknownst to Intersections and NEI, devoted increasingly more time to LE as its Chairman and CEO, and, by the summer of 2008, devoted almost no meaningful time to NEI.

18. The business of NEI suffered and all parties began to recognize that the employment arrangement was not going to work.

---

[2] LE was a high-end residential construction company with subsidiaries that provided architectural, design, financing, and import services.

-5-

19. Then an NEI employee came forward with complaints that the Debtor was requiring certain NEI employees and independent contractors to devote substantial amounts of their working time to LE and that he was abusive and threatening if they refused.

20. NEI employees also revealed that the Debtor had been operating and managing LE since Intersections acquired NEI, that he rarely came into NEI's office, and that he devoted only a few hours each week to NEI.

### NEI's Suspension and Termination of the Debtor

21. Based on the information provided by the employees, NEI suspended the Debtor with pay on October 20, 2008 pending a complete investigation of the employees' claims.

22. By letter dated that same day, NEI advised the Debtor that it was suspending him for breaching his fiduciary duties to NEI and violating company policies.

23. Within hours of his suspension, the Debtor began a systematic campaign to intentionally and willfully destroy material evidence in an effort to conceal the fraud and malfeasance he and his sister perpetrated on Intersections and NEI.

24. As a result of this conduct and based on the Debtor's breach of his fiduciary duties, NEI terminated the Debtor for cause by letter dated November 19, 2008.

### The Virginia Litigation

25. After terminating the Debtor's employment, Intersections and NEI broadened their investigation into analyzing NEI's financials and those emails and documents that the Debtor had not been able to destroy.

-6-

Case 2:10-bk-01885-RJH   Doc 42   Filed 02/18/10   Entered 02/18/10 15:12:10   Desc
Main Document    Page 6 of 17

26. Intersections and NEI learned that the Debtor and Jenni Loomis had conspired to and did misrepresent material information regarding NEI's business and financial condition to Intersections before the Closing to induce Intersections to pay more for NEI's stock than it was worth.

27. On May 27, 2009, Intersections and NEI filed the Virginia Litigation in the United States District Court for the Eastern District of Virginia. A copy of the docket report from the Virginia Litigation is attached hereto as Exhibit 1.

28. Movants asserted claims against the Debtor for securities fraud, breach of the SPA, fraud, tortious interference with business relationships and expectancies, breach of fiduciary duty, conversion, and civil conspiracy, and claims against Jenni Loomis for fraud and civil conspiracy, seeking rescission of the SPA and compensatory and punitive damages. A copy of the Complaint without exhibits is attached hereto as Exhibit 2.

29. The Debtor and Jenni Loomis, initially represented by Bryan Cave LLC, moved to dismiss the claims asserted against Jenni Loomis and certain of the claims asserted against the Debtor. The Eastern District of Virginia denied the Debtor's and Jenni Loomis' motion to dismiss on July 24, 2009.

30. The Debtor also asserted counterclaims against Intersections for breach of the SPA, against NEI for breach of the Employment Agreement, and against both Intersections and NEI for breach of duty of good faith and fair dealing, seeking damages in excess of $10 million.

31. In late August 2009, Bryan Cave LLC withdrew its appearance on behalf of the Debtor and Jenni Loomis.

32. The Debtor and Jenni Loomis then hired Hunter, Humphrey and Yavitz PLC in Phoenix, Arizona as lead counsel, and Dunlap, Grubb and Weaver, PLLC in Virginia as local counsel.

33. What followed was two months of harassment by the Debtor and Hunter, Humphrey and Yavitz of Intersections, NEI, their witnesses, and their counsel, including the filing of a baseless criminal complaint. On October 30, 2009, the United States District Court for the Eastern District of Virginia issued a Protective Order against the Debtor and his counsel ordering them to cease and desist any and all direct communications with Intersections, NEI, their witnesses or their counsel, except through local counsel, Dunlap, Grubb and Weaver. The court also ordered that all depositions scheduled in Arizona be held in Virginia, at the Debtor's expense. Hunter, Humphrey and Yavitz withdrew as counsel, and Dunlap, Grubb and Weaver became lead counsel, as they were unable to find counsel willing to take the case and be subject to potential further sanctions under the protective order.[3]

34. Discovery in the Virginia Litigation closed on Friday, December 11, 2009.

35. Trial was set to begin on March 1, 2010 before the Honorable Leonie M. Brinkema and last two weeks.

36. On January 13, 2010, Intersections and NEI filed a Motion for Sanctions Against the Debtor Due to His Intentional Destruction of Evidence (the "Motion for

---

[3] The United States District Court for the Eastern District of Virginia also granted the Movants' motion to compel discovery responses and awarded Intersections and NEI attorneys' fees and other expenses in connection with the Debtor's and Jenni Loomis' failure to comply fully with their discovery obligations. Though the amount of the award had not been determined as of the date of the Debtor's bankruptcy filing, the Eastern District of Virginia indicated that it expected the amount to be "substantial."

-8-

Sanctions"), seeking a default judgment against the Debtor as a result of his intentionally destroying electronic data contained in two NEI-related computers after he was terminated and in one NEI-related computer after the Virginia Litigation was filed. The parties agreed to the Settlement the next day, and then the Debtor filed for bankruptcy.

**The Settlement**

37. At the request of the Debtor and Jenni Loomis, Intersections and NEI participated in a settlement conference with the Debtor and Jenni Loomis before United States District Magistrate Judge Theresa Carroll Buchanan in her chambers on Thursday, January 14, 2010. The Debtor and Jenni Loomis were accompanied by their counsel, Thomas Dunlap and Ellis Bennett of Dunlap, Grubb and Weaver. Intersections and NEI were represented by Intersections' Executive Vice President and Chief Legal Officer, Intersections' Vice President and Associate General Counsel, and Intersections' Chief Operating Officer, who also is the Chairman of the NEI Board. The CEO and Chairman of Intersections participated by telephone. Intersections and NEI were accompanied by their counsel, DLA Piper LLP (US).

38. The settlement conference began at 1:30 p.m. and lasted well into the evening, taking approximately six hours. The parties settled all claims during the settlement conference.

39. At the conclusion of the settlement conference, Judge Buchanan called all of the parties into a conference room in her chambers and read aloud her handwritten list of the material terms to which the parties had agreed. Each party verbally agreed that Judge Buchanan's handwritten list contained the material terms of the agreement and was

-9-

controlling and that the case was settled. Judge Buchanan provided each party with a copy of the handwritten list of material terms.

40. Pursuant to the settlement that was agreed upon by the Debtor, Jenni Loomis, Intersections, and NEI before Magistrate Judge Buchanan (the "Settlement"), the Debtor and Jenni Loomis agreed to pay to Intersections and NEI a total of seven million dollars.[4]

41. Over the next several days, Intersections and NEI drafted the settlement documents as agreed and provided drafts to counsel for the Debtor and Jenni Loomis.

42. On the evening of Wednesday, January 20, 2010, Dunlap, Grubb and Weaver informed Intersections and NEI that, despite the Settlement reached before Magistrate Judge Buchanan, Jenni Loomis refused to sign a confessed judgment promissory note (the "Note") as she was afraid the Debtor would default and she would be left to pay the Note herself. Counsel indicated that the Debtor still was willing to sign the Note and the settlement agreement.

43. The following day, on January 21, 2010, Dunlap, Grubb and Weaver advised that they were required by their ethical obligations to withdraw from their representation of the Debtor and Jenni Loomis as a result of an irreconcilable conflict of interest.

44. What followed was a series of teleconferences with Magistrate Judge Buchanan in an effort to enforce the Settlement.

45. Dunlap, Grubb and Weaver withdrew their appearance on or about January 22, 2010. The Debtor and Jenni Loomis each hired their own counsel. According to the

---

[4] Although the terms of the Settlement are confidential, the Debtor disclosed the existence and amount of the Settlement in his List of Creditors Holding 20 Largest Unsecured Claims filed with this Court on January 27, 2010.

-10-

engagement letter filed with this Court, the Debtor engaged new counsel in Virginia, Timothy McEvoy, that same day to analyze the enforceability of the Settlement and also hired Gerald K. Smith in Arizona to file for bankruptcy protection.

46. On January 25, 2010, Jenni Loomis agreed to sign the Note and settlement agreement. Although the Debtor acknowledged the existence of a Settlement, he refused to sign.

47. Then, despite acknowledging the existence of the binding Settlement, the Debtor's new counsel, Timothy McEvoy, conveyed a new, significantly lower settlement offer at approximately 10:50 a.m. on January 26, 2010 and threatened that the Debtor would file bankruptcy if a "new" settlement could not be reached by the end of the day. During a scheduled teleconference with Magistrate Judge Buchanan ten minutes later, Mr. McEvoy indicated that he would stay up all night if necessary to work out the terms of a new settlement. Less than an hour later, the Debtor filed for bankruptcy in this Court.

48. The Debtor listed Intersections on his List of Creditors Holding 20 Largest Unsecured Claims that he filed with this Court on January 27, 2010. He declared the amount of the claim to be seven million dollars (the amount of the Settlement), and stated that the claim was in the nature of a settlement.

## **Legal Analysis and Argument**

49. Pursuant to Section 362(d) of the Bankruptcy Code, bankruptcy courts may grant relief from the automatic stay for "cause." Because "cause" is not defined under the Bankruptcy Code, bankruptcy courts must determine when discretionary relief is

-11-

appropriate on a case-by-case basis. *E.g., MacDonald v. MacDonald (In re MacDonald)*, 755 F.2d 715, 717 (9th Cir. 1985) ("Because there is no clear definition of what constitutes 'cause,' discretionary relief from the stay must be determined in a case by case basis.") (internal citations omitted).

50. This Court has held that the following factors are relevant in deciding whether "cause" exists to modify the automatic stay to permit the continuation of litigation in a non-bankruptcy forum: "(1) Whether the litigation causes debtor great prejudice; (2) Whether a balancing of the respective hardships tips in favor of the debtor or creditor, resulting from denial or granting of the relief; (3) Whether public policy supports the type or kind of action the Movant is bringing against the Debtor." *In re America West Airlines*, 148 B.R. 920, 922 -923 (Bankr. D.Ariz. 1993) (internal citations omitted).

51. This Court also has articulated "the following circumstances that a Bankruptcy Court should consider when making its determination whether to modify the stay: (1) Whether insurance is available to defend debtor or whether the defense of the suit will impose a financial burden; (2) Whether judicial economy favors the action to proceed in the court in which it commenced; (3) Whether a likelihood exists that resources used to prepare the matter for trial would be wasted due to the stay enjoining the action from proceeding; (4) Whether the issues are solely state law actions or whether a special tribunal should use its expertise to hear the issues; (5) Whether the litigation involves other parties in which the Bankruptcy Court lacks jurisdiction and whether full relief may be accorded to all non-debtor parties without debtor's presence; (6) Whether

-12-

the creditor has a probability of success on the merits; [and] (7) Whether the Bankruptcy Court should first address the threshold bankruptcy-law issues." *Id*. at 923.

52. When applied to this case, these factors overwhelmingly support modification of the automatic stay to permit Intersections and NEI to continue to prosecute their claims against the Debtor in the Virginia Litigation for the limited purpose of seeking a declaration as to the enforceability of the Settlement.

53. The Debtor will not be prejudiced by modification of the automatic stay for the limited purpose of seeking a declaration as to the enforceability of the Settlement. The Debtor already has retained counsel in Virginia to represent him in the Virginia Litigation. It is not anticipated that the parties would need to expend a substantial amount of time or resources litigating the enforceability of the Settlement, given that all parties, including the Debtor, have acknowledged that there was a Settlement, and that Judge Buchanan herself memorialized the material terms of the Settlement.

54. The expertise of this Court is not necessary for a determination as to the enforceability of the Settlement. The enforceability of the Settlement – the only issue to be decided upon the modification of the automatic stay - will be governed by Virginia law and will not involve bankruptcy law.

55. The promotion of judicial economy supports modification of the automatic stay. The United States District Court for the Eastern District of Virginia is well-qualified to adjudicate the enforceability of the Settlement, given that Virginia law will apply and given the significant amount of time and resources that that court already has invested in the Virginia Litigation and in the Settlement. Indeed, in addition to being the

-13-

magistrate judge who oversaw the Settlement, Judge Buchanan was the motions judge assigned to the Virginia Litigation, so she is well-versed in the history of the case and is most knowledgeable about the Settlement. Further, Judge Brinkema, who would have presided over the trial, ruled on the motion to dismiss, held a pre-trial conference, and was kept abreast of the various discovery and other motions by Judge Buchanan. The U.S. District Court for the Eastern District of Virginia, therefore, is in the best position to efficiently address the issues and to grant the relief requested without any interference with the bankruptcy proceedings.

56. A modification of the automatic stay also is warranted because the Debtor is not the only defendant in the Virginia Litigation; his sister, Jenni Loomis, also is a defendant. The case against Jenni Loomis still is set to go to trial on March 1, 2010, as she will not participate in the Settlement without the participation of the Debtor. Intersections and NEI have sought a 90-day stay with respect to the action against Jenni Loomis so that the United States District Court for the Eastern District of Virginia may rule upon the enforceability of the Settlement as to both the Debtor and Jenni Loomis at the same time, since all parties agreed that both the Debtor and Jenni Loomis would be bound by the settlement agreement and the Note.

57. Both judicial economy and consistency demand that the automatic stay be modified so that only one court's resources are used in determining the enforceability of the Settlement and to avoid the possibility of inconsistent determinations. As the United States District Court for the Eastern District of Virginia must determine the enforceability

-14-

of the Settlement as to Jenni Loomis, the interests of justice and judicial economy both will be served by a modification of the stay.

58. Finally, public policy also demands that the automatic stay be modified to permit the Movants to seek a declaration as to the enforceability of the Settlement. When parties reach a settlement, especially using the resources of a federal judge, it is imperative that the parties be able to rely upon the settlement. There must be finality associated with a settlement, especially where, as here, the parties expended numerous hours working with a magistrate judge to finalize the terms of the settlement. If a party is permitted to walk away after a change of heart, the settlement process will have no meaning.

59. When faced with facts similar to those involved here, courts have held that cause existed to modify the stay. *See, e.g., In re Roberts*, Case No. 01-81072, 2001 WL 1699604 (Bankr. M.D.N.C. Aug, 1, 2001) (modifying the automatic stay to determine the enforceability of a settlement agreement in pending litigation).

60. Based on the foregoing, the automatic stay should be modified to permit Intersections and NEI to continue to prosecute the Virginia Litigation for the limited purpose of seeking a declaration as to the enforceability of the Settlement, with the condition that any such declaration entered in favor of Intersections and NEI will be enforced through this Court.

**Request Regarding Bankruptcy Rule 4001(a)(3)**

61. Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure provides that a motion granting relief from the automatic stay made in accordance with Rule

4001(a)(1) is "stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise." Intersections and NEI respectfully requests that the 10-day period be waived and any order approving the relief requested herein be effective immediately upon entry.

WHEREFORE, Intersections and NEI request that the Court:

(a) Modify the automatic stay to permit Intersections and NEI to continue to prosecute the Virginia Litigation for the limited purpose of seeking a declaration as to the enforceability of the Settlement; and

(b) Grant such other and further relief as is just and appropriate under the circumstances.

RESPECTFULLY SUBMITTED on February 18, 2010.

**DLA Piper LLP (US)**


s/ *Allison L. Kierman*
MARK A. NADEAU
ALLISON L. KIERMAN
2525 East Camelback Road, Suite 1000
Phoenix, Arizona 85016

C. KEVIN KOBBE (admitted *pro hac vice*)
6225 Smith Avenue
Baltimore, Maryland 21209

Attorneys for Intersections Inc. and Net Enforcers, Inc. (Creditors)

| | CERTIFICATE OF SERVICE |
|---|---|
| 1 | |

I hereby certify that on February 18, 2010, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and mailed or electronically transmitted the attached documents to the following:

| | |
|---|---|
| Office of the United States Trustee | Gerald K. Smith |
| 230 North First Avenue, Suite 204 | Gerald K. Smith and John C. Smith Law Ofc |
| Phoenix, AZ 85003-1706 | 40 N. Central Avenue, Suite 1900 |
| Tel: 602-682-2600 | Phoenix, AZ 85004 |
| Fax: 602-514-7270 | Tel: 602-262-5348 |
| | Fax: 602-434-3834 |
| | Gerald@smithandsmithpllc.com |
| | Attorney for Joseph Charles Loomis |
| | |
| Hilary B. Bonial | Timothy J. McEvoy |
| 9441 LBJ Freeway, Suite 350 | 11325 Random Hills Road, Suite 200 |
| Dallas, TX 75243 | Fairfax, VA 22030 |
| Tel: 972-643-6600 | Tel: 703-273-8898 |
| Fax: 972-643-6698 | Fax: 703-273-8897 |
| notice@bkcylaw.com | TMcEvoy@cameronmcevoy.com |
| Authorized Agent for Capital One Auto Finance | Attorney for Joseph Charles Loomis |

A copy of the foregoing was also mailed to Creditor Matrix List as of February 18, 2010.

By  s/*Pat Kelly*

-17-