40 North Central Avenue, 19th Floor
Phoenix, Arizona 85004-4429

Gerald K. Smith, State Bar No: 001428
Direct Dial: (602) 262-5348
Direct Fax: (602) 734-3834
EMail: gerald@smithandsmithpllc.com

Attorneys for Debtor
*Joseph Charles Loomis*

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| In Re:<br><br>JOSEPH CHARLES LOOMIS,<br><br>               Debtor, | Chapter: 11<br><br>Case No. 2:10-bk-01885<br><br>**JOSEPH C. LOOMIS' MEMORANDUM IN OPPOSITION TO MOTION FOR ORDER GRANTING LIMITED RELIEF FROM AUTOMATIC STAY** |

Joseph C. Loomis ("Mr. Loomis" or "Debtor"), by counsel, respectfully files this memorandum in opposition to the "Motion For Order Granting Limited Relief From Automatic Stay" (the "Motion") filed by Movants Intersections, Inc. and Net Enforcers, Inc. (collectively, "Movants"). Movants acknowledge that their filing is for "the limited purpose of seeking a declaration as to the enforceability of [an alleged] settlement" in the United States District Court for the Eastern District of Virginia (the "Virginia Court"). Motion at p. 2. Mr. Loomis respectfully requests that this Honorable Court deny the Motion for the reasons set forth in the following memorandum of points and authorities.

## OVERVIEW

1. The Motion should be summarily denied for several independent reasons, including but not limited to the following points:

a. Congress has vested this Court with presumptive authority to adjudicate all matters related to the preservation, maximization and efficient administration of Mr. Loomis' estate. This is a truism to which the present case provides no reason for exception.

b. There was no settlement for the objective and simple reason that the settlement terms, and an accompanying confessed judgment note, had to be embodied by signed documents (as a matter of law in the case of the confessed judgment). Movants' counsel, recognizing this, sent drafts of a settlement agreement and confessed judgment to Mr. Loomis' counsel. However, these documents contained many new or materially different terms that were never discussed at the settlement conference. No final agreement was ever reached, much less signed.

c. There was no settlement as a result of the unclean hands and fraudulent acts of the Movants. Specifically, Movants made material misrepresentations of fact in a motion for sanctions (the "Sanctions Motion") that was pivotal to the term sheet that was supposed to evolve into a written, signed settlement agreement and a written, signed confessed judgment note.

d. The doctrine of equitable subordination may apply in this case, requiring the Court to consider the sharp practices referenced above.

## FACTS

1. Mr. Loomis is a 34-year-old entrepreneur who served honorably in the intelligence arm of the United States Navy as an electronics technician and cryptographic engineer with a top secret clearance. Mr. Loomis was also the recipient of a commissioned officer scholarship during his enlistment which allowed him to obtain his college education. He applied his training to the Internet and operated a company in Phoenix, Arizona (Net Enforcers, Inc.) that focused on civil and federal investigations involving cyberspace. Mr. Loomis, who is also a registered Private Investigator in both Arizona and Florida, has worked with private companies, a special unit of the Federal Bureau of Investigation ("FBI") devoted to cybercrime, the Federal Immigration and Customs Enforcement Agency ("ICE") and the Federal Drug Enforcement Agency ("DEA").

2. Mr. Loomis' client base came to include such companies as Apple, Microsoft, Cisco, Eli Lilly and Novartis. His business became very valuable, and he soon was faced with the prospect of being able to sell it for a substantial amount of money.

3. Movant Intersections was one of many suitors interested in Net Enforcers. Over the course of 10 weeks, it spent over a million dollars in due diligence costs studying Net Enforcers' financial records, technology portfolio and customer data (among other things). It closed a deal to purchase Net Enforcers on or about November 30, 2007.

4. Although Movant now contends that Mr. Loomis and his sister "cooked the books" to allow Mr. Loomis to get more consideration for his company, and while that issue remains to be submitted to a trier of fact, there is no legitimate basis for Movants to allege that legal fraud was committed.

5. Indeed, while the case involves disputed facts, Movant Intersections created an internal report (the "Report") that was reviewed by in-house counsel and forwarded to its auditors. The Report examined the transactions which are now labeled "fraud" and concluded that any errors or misstatements were not material to Intersections' business. *See* Exh. 1 (to be filed under seal herewith).[1] The Report also found that these transactions had, at worst, caused a relatively small amount of damage that did not merit remedial action by Net Enforcers. *Id.* at pp. 2-6. Intersections also failed to notify its shareholders about the allegations, presumably under the rationale that the alleged "fraud" was not

---

[1] Documents that were produced in the Virginia Litigation that were labeled "Confidential" are subject to a Protective Order. By Agreement of counsel, through Mr. McEvoy and Mr. Kobbe, all such documents will be filed under seal to comply with the Protective Order until this Court or the Eastern District of Virginia modifies that arrangement.

material and/or that the relatively minor damages made it unnecessary to take corrective action with respect to its financial statements or financial reporting.[2]

6. The Report was not surprising, since Movant had previously represented that:

[It] has had the opportunity to conduct its own independent review and analysis of the Business and of [Net Enforcers], its financial condition, cash flow and prospects. . . . [Exh. 2, p. 32]

7. Movants' management decided -- well before any of Mr. Loomis' alleged malfeasance was "discovered" -- that Mr. Loomis was not the CEO it wanted to run Net Enforcers. In or about August 2008, months before he allegedly knew that Mr. Loomis was involved in another, non-competitive business, Intersections' Chief Operating Officer Michael Scanlon sent an email to Intersections' Chief Executive Officer, Michael Stanfield, in which Mr. Scanlon stated that the company should get rid of Mr. Loomis and that he could be given additional stock options that would never vest since he would likely be terminated. Exh. 3 (filed under seal). Not a word was published concerning the alleged "book cooking" that was already known to Movants' internal personnel. Those allegations did not appear until the Virginia litigation was filed on May 27, 2009 (the "Virginia Litigation").

8. The clandestine directive to get rid of Mr. Loomis so that his stock options could not mature was coupled by express directions to Mr. Loomis (by CEO Stanfield) that he should remove himself from the day-to-day operations of Movant Net Enforcers. The writing was on the wall.

---

[2] Movants contend that Mr. Loomis took certain steps to hide the fact that certain "top 20" customers had ceased doing business with Net Enforcers. This was a fact that should have been apparent almost immediately after the acquisition, however, at the latest. Furthermore, the Movants were provided detailed

9.  When Mr. Loomis was told that he should reduce Net Enforcers' headcount in the late summer of 2008, he informed an employee named Mathew Leberer that he was going to be reduced to part-time status and also started careful review of other employees who were to be terminated.

10.  Mr. Leberer and another employee (Jason Wood, Net Enforcers' unlicensed "General Counsel"), did not like the changes on the horizon and attempted to solve their problems by getting rid of Mr. Loomis.  Accordingly, on or about October 1, 2008, Mr. Leberer sent a document to Movants and Mr. Wood that alleged that Mr. Loomis was spending time with Loomis Enterprises, Inc., a company operated by Mr. Loomis' brother, Christopher Loomis, on the floor above Movant Net Enforcers.  Movant Intersections used this information as a pretext to suspend Mr. Loomis on October 20, 2008.  Yet even though Movants knew of material facts that now form the basis for their claims that Mr. Loomis erased substantial amounts of inculpatory evidence from computer servers, Mr. Loomis was not terminated until November 20, 2008.

11.  Movants knew that they were going to have a problem proving damages given: (a) their expenditure of over $1,000,000 in due diligence costs related to the acquisition without allegedly uncovering the "fraud" they would later allege; (b) Intersections's own internal report finding that any damage attributed to Mr. Loomis was immaterial; (c) its decision not to report anything to Intersections' shareholders; (d) the fact they did not fire Mr. Loomis for a month despite the misconduct now alleged in this case; (e) the telling historical fact that Movants did not engage in a "legal hold" of discovery documents until

contact information of these same customers as well as permission to contact them prior to the closing of

2163106.1

in or about May 2009, when they sued Mr. Loomis in federal court in Virginia (and only after he had demanded arbitration).

12. In the Virginia Litigation, Mr. Loomis came to be represented by a Phoenix-based law firm, Hunter, Humphrey & Yavitz, PLLC ("Arizona Counsel") using well-regarded local Virginia counsel ("Local Counsel"). The merits of the case became obscured after Arizona Counsel, in short, threatened to have Movant Intersections' counsel subjected to criminal process in Arizona as a result of Intersections' failure to return a personal computer to Mr. Loomis. The Virginia Court became extremely upset at this, to say the least. As the Judge stated:

> This is without a doubt the most outrageous conduct by an attorney that I have ever seen, not only on the bench but in private practice and in the U.S. Attorney's Office . . . . You [Arizona counsel] could have brought a motion before me to have [the laptop] returned. Instead, you chose to have your client file a criminal complaint apparently against the plaintiff, but you misrepresented to plaintiffs' counsel that it was also against them and that-- Yes, you did. I looked at the e-mail. And that they might be subject to arrest when they step into [Arizona] for depositions. How dare you. How dare you do something like that. I just cannot believe it. I will not allow you to conduct yourself in this manner and practice before this Court. It will not happen in the future, period. [Exh. 4, pp.12-14]

The Judge proceeded to enter an Order that banned Arizona Counsel from contacting witnesses, communicating directly with Intersections' counsel, requiring all depositions to be taken in Virginia regardless of witness location, and requiring all contact with the Virginia Court to be through Local Counsel. Exh. 4, p. 14-15 ("[Arizona Counsel is] not to contact plaintiffs' counsel directly by phone, by e-mail, by letter . . . .").

the acquisition.

13. According to Local Counsel, the entire tenor of the litigation changed in an irreparably harmful manner for Mr. Loomis from that point forward even though he was just following the advance of his Arizona Counsel. While Local Counsel is seasoned and experienced in the Virginia Court, it had to assume the lead role in a case involving 900,000 pages of discovery material with just over a month left in discovery. Approximately 18 depositions were taken in that time frame, and discovery closed on December 11, 2009.

14. The parties agreed to mediate the claims through the Virginia Court and a settlement conference was scheduled for January 14, 2010, in front of the same Magistrate Judge who had essentially banned Arizona Counsel from the case. On January 13, 2010, after the discovery period had closed, Plaintiffs submitted a "Motion for Sanctions" that went to extraordinary lengths in arguing for the granting of the "harshest sanctions available" – i.e., a default judgment. Exh. 5A, p. 3 (the "Sanctions Motion").

15. After reciting every possible *ad hominem* argument against Mr. Loomis that it could muster, Movants represented to the Court that a merits trial had been forfeited by Mr. Loomis because he had allegedly spoliated "all" of his electronic files on Movant's server and on three other computers. The allegation that Mr. Loomis had deleted "all" of his server files was repeated not less than five times, both as a caption for the lead argument for default and in the text. Exh. 5B, pp. 4-5.

16. This Sanctions Motion was supported by a Declaration from Mr. Leberer, who basically alleged that he had "resigned" due to pressure from Mr. Loomis to work for Loomis Enterprises. *See* Exh. 5A (Leberer Declaration attached thereto as Exhibit C).

The careful wording of this Declaration and another Declaration from Christopher Soyars supported the express allegations in the brief that Mr. Loomis had deleted "all" of his electronic files from Movants' server even though neither Messrs. Soyars nor Leberer claimed to know this as a fact.

17. It is clear that Movants planned to file the Sanctions Motion after the discovery cut-off because they had all the information they needed, including Mr. Leberer's Declaration, no later than October 29, 2009 (the date Mr. Leberer signed his Declaration). Plaintiffs noted Mr. Leberer's deposition for a few days before the discovery cut-off and then cancelled it. Local Counsel, unaware of the role Mr. Leberer was about to play in the Sanctions Motion, did not object.

18. Needless to say, Local Counsel was understandably at an enormous disadvantage when Movant Intersections hatched its plan and filed the Sanctions Motion the day before the settlement conference. Against a poisoned backdrop that included the ban on Arizona Counsel (and as reflected by the harsh language and remedy employed by the Court, *see* above at ¶12), Movants used the Sanctions Motion aggressively. It played a major role in the settlement proceedings based on comments made by the Judge both at the time and afterwards. The Judge even suggested that she was inclined to grant the Sanctions Motion if the case did not settle and conclude by Friday, January 29, 2010.

19. Clearly, therefore, the carefully drafted Sanctions Motion was a material feature of the atmosphere surrounding the alleged settlement in this case.

20. Local Counsel are prepared to testify that their view of the case, and their strategy, was significantly impacted by the Judge's emphasis on what she perceived to

2163106.1

have been discovery abuses and the Sanctions Motion.[3]  The pendency of the Sanctions Motion was an important consideration for them, and it was a factor that led to a term sheet being verbally agreed upon by all parties at the conclusion of the settlement conference on January 14, 2010.  That term sheet (the "Term Sheet") is arguably subject to a confidentiality clause, as noted by Movant, and has been filed under seal.  Exh. 6.

21.  The Term Sheet speaks for itself, but the terms contained therein were never reduced to a formal, signed agreement.  Such an integrated, signed agreement was a mandatory precondition to settlement, as an examination of the Term Sheet will make plain.  Indeed, the Court will immediately see that there are several references to the necessity for a "signed" agreement.  Consistent with this understanding, Movants' counsel sent Local Counsel a draft settlement agreement and a draft confessed judgment note.  Exhs. 7 and 8.

22.  The Term Sheet set dates by which both a written agreement and a confessed judgment note had to be drafted and signed, and it did not permit an initial payment to occur until the settlement agreement was signed.  Exh. 6 (upper right-hand side).  If the Term Sheet was sufficient, in and of itself, to constitute the parties' entire agreement, it could have been signed at the Settlement Conference and this brief would have been unnecessary.

23.  Incredibly for a party now moving to enforce a non-existent confessed judgment note and a non-existent settlement agreement, Movant Intersections only circulated "draft" agreements that contained terms that went well beyond anything

---

[3]  The Court's Order of October 30, 2009, was also directed at Mr. Loomis.

2163106.1

contained on the Term Sheet, and in some cases were in direct contradiction to it. *See* Exhs. 7 and 8 (containing "draft" headers in upper right hand corners).

24. For example, when this Court reviews the Term Sheet (Exh. 6), it will *not* see the following new provisions that Movants attempted to insert into the draft agreement: Exh. 7, ¶3(b-f) contains expanded and new provisions relating to the appraisal of certain properties; the terms under which the Virginia Litigation is to be dismissed (Exh. 7, ¶5) are actually contrary to what is written on the face of the Term Sheet regarding dismissal; even though the Term Sheet speaks expressly to the question of whether Mr. Loomis' employment agreement was to survive as a legal obligation in any way, Movants Intersections attempted to incorporate certain elements from that agreement into the draft settlement agreement, Exh. 7, ¶8 (this was no small request as the portion of Mr. Loomis' employment agreement in question contains 21 subsections imposing different obligations – *see* Exh. 9); the draft settlement agreement purports to require certain representations and warranties that are in no way reflected in the Term Sheet (*see* Exh. 7, ¶¶9-10); ¶¶11 (second sentence) 13, 15-16 of the draft settlement agreement are brand new additions; and ¶18 contains an integration clause that purports to merge all prior negotiations and understandings concerning settlement into the new draft.

25. The draft confessed judgment note, likewise, contains numerous terms that were never discussed much less agreed upon. These include provisions for the accrual of interest upon default (at a high rate above the judgment rate in Virginia), the collection of fees and costs upon default, the waiver of certain legal rights, the appointment of Movants' counsel as attorneys-in-fact, and the choice of forum.

26.  Clearly, therefore, the "drafts" that were circulated were essential insofar as the Term Sheet clearly recognizes that it, alone, was not a sufficient expression of any settlement because it mandates that there be signed, final documents.  However, there never were such final, signed documents.  Beyond the fact that no final agreement or note was ever agreed upon (despite negotiations that resulted in several different drafts), that no binding settlement occurred is also obvious because the Court did not remove the Sanctions Motion from its January 29, 2010, docket.  If the Court felt that a settlement agreement had occurred based on the Term Sheet alone, thereby concluding the case, there would have been absolutely no need to keep the Sanctions Motion on the docket.  The undersigned even asked for a continuance in a teleconference with the Court after making an initial appearance, but that motion was denied.

27.  Beyond the foregoing, the Court will see that a method of funding the settlement involved certain large value assets that are not entirely under the control of Mr. Loomis, including three assets in which his brother invested retirement savings.  Exh. 6. That brother, Christopher Loomis, is the CEO of Loomis Enterprises, Inc. and a retired Florida Battalion Fire Chief.  The assets in question were a cornerstone of the deal and the ability to transfer them (and thereby dedicate the proceeds to the settlement) was a contingency that was known to all parties.  Without these assets, or if they had been mistakenly overvalued by Mr. Loomis, he could not have funded the deal in the first place. Accordingly, the failure of these assets to transfer or sell within the required time period involved the failure of a condition or a mutual mistake of fact.

28.  After the Term Sheet was reduced to writing, and as noted by Movant, Mr. Loomis' counsel had to withdraw due to a conflict of interest between Jenni Loomis and Mr. Loomis.  It is significant that Movants recognize that the conflict arose after Jenni Loomis *refused to sign the confessed judgment note*.  Obviously there had to be a confessed judgment note to sign, by a date certain, but to this day there is no such note.

29.  When the undersigned was hired, an email from Mr. Leberer (a Declarant in the Sanctions Motion) came into his possession from an attorney in New York.  In that email, attached hereto as Exh. 10, Mr. Leberer admits that *he* had been the party who had deleted the bulk (if not all) of the data on Net Enforcers' server that had been falsely attributed to Mr. Loomis in the Sanctions Motion.  He also disclosed that he had confessed his conduct to Intersections' in-house attorneys in *October 2008*.[4]  To make matters worse, it turned out that Mr. Leberer had been fired for this conduct, though his separation agreement allowed him to say that he had "resigned."  In sum, Movant could not truthfully allege, as it nonetheless did repeatedly, that Mr. Loomis had deleted "all" of his server data.  Movant had known for over a year that this was not true, which appears to be why Mr. Leberer's carefully worded Declaration never makes that claim directly.

30.  Movants' use of a Declaration indicating that Mr. Leberer had resigned, while technically true, was also misleading under the circumstances because if the truth about his termination had been known it would have become clear that Movants' brief was untrue in material measure.  (The Court will recall that Movants cancelled Mr. Leberer's deposition at the last minute and Local Counsel did not object since Mr. Leberer's "knowledge" of

2163106.1

alleged spoliation had never been disclosed at any point in time; the Sanctions Motion was held back until the discovery period was closed.)

31. Mr. Leberer did not contend, in either his email or his Declaration, that he had deleted data at Mr. Loomis' urging. Rather, he admitted that he ignored a direct order from the company's COO not to delete anything but deleted the data because he thought it was no longer needed. This is an incredible excuse, but one known to Movants long ago.

32. Mr. Leberer was also privy to at least two of the other three computers involved in alleged spoliation and could have easily destroyed that data as well (the circumstances surrounding the alleged loss of data as to the fourth computer are also disputed).[5] He certainly had a motive. As noted, Mr. Leberer feared that Mr. Loomis was going to reduce his hours or terminate him from Net Enforcers, and thus he informed Movants that he believed Mr. Loomis was spending time at Loomis Enterprises and thought to use it to have him terminated.

33. Mr. Loomis' claims are not merely allegations. After demand was made upon Movants to file a corrected pleading, it did so (albeit inadequately). Although Mr. Loomis filed a brief explaining the circumstances due to the fact that the misstatements appeared intentional, the Virginia Court took no action as a result (presumably in deference to the bankruptcy process).

---

[4] Even outside counsel alleged that she had been "intimately involved in every aspect of the spoliation," so there can be no claim that the unqualified and repeatedly-made allegations were inadvertent.

2163106.1

34.  Any objective analysis of the Sanctions Motion and the backdrop against which it was filed reveals that default judgment could have *never* been a serious possibility if Movants had been candid.

35.  Due to the Movants' lack of candor, which took advantage of the Virginia Court's already poisoned view of Mr. Loomis and hardships faced by Local Counsel, the settlement process became improperly and wrongfully tainted.  It was, in an important respect, the Virginia Court's emphasis on the potential for default judgment that led to the Term Sheet in the first place.

## **ARGUMENT**

36.  In a Chapter 11 case, the Court serves as a neutral arbiter of often competing claims on a limited estate in need of reorganization.  *See generally In re Patel*, 291 B.R. 169 (D. AZ. 2003) (Haines, J.).  Lifting a stay requires a showing of "cause."  *Id.* at 172, *citing Benedor Corp. v. Conejo Enterprises, Inc.* (In re Conejo), 96 F.3d 346 (9th Cir. 1996).  While the Motion lists a number of factors that should be considered when evaluating cause to lift a stay, this Court used *In re Patel* as an opportunity to flesh out and apply certain considerations when a single creditor seeks to reduce a claim to judgment in another court.

37.  In *Patel*, this Court first considered the jurisprudential issue of whether the

---

5   For example, Mr. Loomis returned one of his computers to Movant the day after he was fired (the "Work Laptop").  By that time, he had been under active "investigation" for at least a month and Movants were in hot pursuit of all of his computers.  Thus, Movants sent a memo to Mr. Loomis on November 24, 2008 demanding the return of a desktop computer but not the Work Laptop.  Mr. Loomis contends that the memo did not mention the Work Laptop because Movants *already had it*.  If the factfinder believes this, and believes that Movants knowingly made false statements in a pleading filed to obtain an advantage in settlement, it calls into serious question a host of credibility determinations related to Movants' positions in the entire case.

other litigation concerns "uniquely" state law issues like domestic relations or whether the matter concerns "ordinary commercial and partnership disputes of the kind that are routinely heard by bankruptcy courts." *In re Patel* at 172. As in *Patel,* this case clearly concerns the latter kind of issue; to wit: an alleged settlement contract and a confessed judgment note in a commercial dispute. Thus, there is no need for this Court to apply any special deference to "unique" state law.

38. Accordingly, *Patel* lists a number of other factors to be considered, starting with whether the case involves the interests of only two parties or whether it has implications for a broader class of creditors. *Id.* at 172-73. Although the Virginia Litigation does concern essentially two parties (Intersections/Net Enforcers and Mr. Loomis), it involves one creditor's attempt to liquidate to judgment a purported settlement outside a bankruptcy process involving multiple creditors. *Patel* clearly emphasized the preference for multi-party interests to be adjudicated in the bankruptcy forum.

39. *Patel* also gave particular care to note the "fundamental" principle that debtors are entitled to "a breathing spell from their creditors" so that, among other things, they can consider the best way to possibly liquidate assets and negotiate an intelligent reorganization plan. *Id.* at 173. This "breathing spell" provided by the automatic stay "is not merely for the benefit of the debtor, but is for the benefit of the entire estate and creditor body." *Id.* Summarizing the principles at stake, and in words fully applicable here, this Court stated that:

> [It is] for this reason as well, [that] the administrative bankruptcy processes are better suited to the interests of multiple parties, which is a valuable benefit to the estate that should not lightly be foregone simply due to the

2163106.1

happenstance that a creditor's litigation was close to trial or close to judgment before the bankruptcy case was filed. That fluke of timing has little or nothing to do with what the debtor's energies and resources should be focused on for the benefit of the entire estate and creditor body [*Id.*].

40. *Patel* also stated as a third factor that "the bankruptcy court is in a better position than is a nonbankruptcy court to ascertain what is important to be decided and when, and what may be moot or may be resolved by alternative processes such as confirmation of a plan. In that context, nonbankruptcy court litigation may be extremely wasteful." *Id.* at 174. While Movants contend that the settlement issue is discrete, there are substantial defenses and bankruptcy issues such as equitable subordination that may take on the nature of mini-trials with attendant discovery. This Court should supervise that process in order to avoid what it has called a "fourth" factor, to wit: the avoidance of duplicative litigation if creditors later lodge objections to Movants' claim or because of issues such as equitable subordination. *See Id.* at 174.

41. Finally, *Patel* noted as a sixth factor[6] the clear policy in favor of adjudicating all creditor claims in a bankruptcy forum:

> . . . . [As] noted by the [Ninth Circuit], it is important for a bankruptcy court to preserve a level playing field for all parties to negotiate a plan. [Cite omitted]. To do so, no creditor should be given the opportunity to liquidate his claim on his schedule in his chosen forum, while other creditors are denied that strategic advantage. Indeed, it would be particularly inappropriate to grant such preferential leverage to one creditor simply because he got closer to judgment before bankruptcy intervened, because such a policy would encourage a rush to the courthouse that has always been recognized as contrary to sound bankruptcy policy . . . . [*Id.* at 174-75]

42. Based on *Patel*, and given the statutory authority from Congress that places matters such as the Loomis case into the jurisdiction of this Court, there is no

2163106.1

1  "cause" to lift the stay so that one creditor can attempt to liquidate a claim to

2  judgment in a non-bankruptcy forum.  This conclusion is only cemented by the fact

3  that this Court should summarily deny the Motion as a result of the first ground set

4  forth below.  If it needs to reach the other issues at all, the case should also stay in

5  Arizona for the reasons stated.

## A.  THERE IS NO SETTLEMENT AS A MATTER OF LAW

43.  The Court can plainly see that the Term Sheet contemplated that the parties

were to draft and sign both a written settlement agreement and a confessed judgment note

by dates certain and that a material obligation did not have to be performed until there was

a signed settlement agreement.  If the Term Sheet had been sufficient to create a binding

obligation, it could have been signed on the spot, or the settlement could have been placed

upon the record the next morning.

44.  Under Virginia law, a settlement that includes a term requiring it to be reduced

to a signed writing is not enforceable unless and until that contingency is fulfilled.

*Golding v. Floyd,* 261 Va. 190 (2001) (finding that a handwritten "Settlement Agreement

Memorandum" agreed to at a mediation was not a binding settlement where it was

understood that a formal settlement agreement had to be drafted and signed by the parties);

*Boisseau v. Fuller,* 96 Va. 45 (1898) (contract not formed despite agreement to material

terms where parties wrote that formal lease had to be drafted and agreed to); *but compare*

*Snyder-Falkingham v. Stockburger*, 249 Va. 376 (1995) (settlement reached at mediation

enforced where, among other things, the parties immediately terminated judicial

---

6  A fifth factor, bifurcation, has no applicability in this case.

2163106.1

proceedings in recognition of the settlement). Exh. 11 (Virginia cases). Here, the Term

Sheet not only expressly contemplates that there is to be a formal settlement agreement, it

also states that performance of a material term is not due until such an agreement is

signed. *See* Exh. 6.

45. Movants admit that a confessed judgment note was also required. Not only is it

obvious that such an instrument had to be embodied in a document, but it had to occur as a

matter of law because Virginia requires that a confessed judgment note contain certain

mandatory terms in order to be effective. Va. Code §8.01-433.1 (requiring "boldface

print" of jury waiver); §8.01-435 (requiring specific details such as the identities of the

persons authorized to confess judgment and the specification of the clerk's office where

judgment may be confessed). Exh. 12 (copies of statutes). The most fundamental of these

is the waiver of a right to a jury trial, a right held to be "inviolate." Va. Const., Art. I, §11;

Va. Code §8.01-336(A). No court can create a confessed judgment note out of whole

cloth, and no federal court in a diversity case can waive a right to a jury trial *sua sponte*.

46. Although Movants' counsel forwarded "draft" documents, they contained

terms that were clearly never contemplated at the settlement conference, including terms

lifted from Mr. Loomis' employment agreement. The settlement agreement also contained

an integration clause, which by its very nature is intended to wrap all prior negotiations

into a final, written agreement. The inability of the Term Sheet to be sufficient as a

standalone instrument, the addition of new terms, the attempt to supercede the Term Sheet

and the refusal to take the Sanctions Motion off the docket and declare the case settled is

2163106.1

simultaneous evidence that there was no final, binding settlement agreement and evidence that Movants tendered a counteroffer by including new terms in a new "draft" instrument.

47. Indeed, had the Court viewed the Term Sheet as binding, there was no need to maintain the Sanctions Motion on its docket because all potential sanctions sought by the Movant Intersections would have been compromised and merged into a settlement. This Court is invited to study the Term Sheet itself for issues relating to the scheduling question on the Sanctions Motion. It was treated as alive and well, not compromised. The Virginia Court made it clear that the only way it was coming off the docket was if the parties reported that they had, indeed, concluded a settlement.

48. In sum, and beyond the reasons already stated earlier in this brief, there cannot be "cause" to lift the stay in this case because it is elementary that there was no settlement. There is no point in sending this case back to Virginia to determine that issue, and no special knowledge is required to address it. It would be a waste of time and resources that are better devoted to the issues that must be addressed in this Court, for the reasons articulated in *In re Patel*.

## B. MOVANT HAS UNCLEAN HANDS

49. As detailed above and particularly in Exh. 5B, Movant knowingly filed a brief on the eve of the settlement conference that was designed to be a "game-changing" document. It contained what are now acknowledged to be false statements that required the filing of a corrected pleading.

50. The significance of this filing cannot be overstated. Mr. Loomis had been forced to turn to Local Counsel with only a short time left in the discovery period as a

2163106.1

result of an order of the Virginia Court that essentially prohibited Arizona Counsel from participating in the case. Indeed, "defendants and defendants' counsel" [later clarified to mean Arizona Counsel] was banned from taking depositions in Arizona, acting as lead counsel, or contacting plaintiffs, plaintiffs' employees or plaintiffs' witnesses. Exh. 4. Arizona Counsel was not even allowed to have an oral conversation with Movants' counsel or send them a letter. *Id.* With this as a background, it demonstrates how ripe this case was to be manipulated by a pleading containing false statements accusing Mr. Loomis of spoliation in sweeping, absolute and unforgiving terms.

51. Had the brief been candid, the situation would have appeared differently. In fact, Movant knew that the person who had admittedly engaged in the data erasure, and who had been fired for it, also had access to at least two of the other three data sources which are the subject of the Sanctions Motion.

52. The foregoing facts created a "perfect storm" adverse to Mr. Loomis that was exploited by Movants to seek a potential settlement that, for reasons partly in their own control, never came to pass. Because Movants cannot possibly deny that they overreached, even though they knew the true facts as early as October 2008, they have unclean hands and must not be allowed to benefit themselves at the expense of other creditors or Mr. Loomis.

53. As a result of Movants' unclean hands, and for the reasons set forth in paragraph 48, this Court should deny the Motion. *Firebaugh v. Hanback,* 247 Va. 519, 526-27 (1994) (specific performance of alleged contract subject to unclean hands defense; Court also notes that "a court of equity may be justified in applying the 'cleanhands'

2163106.1

doctrine against a litigant who fails to communicate material facts, even when he owes no fiduciary duty to do so").

## C.  THE SETTLEMENT WAS INDUCED BY FRAUD

54.  The misstatements in the Sanctions Motion created a situation in which a false impression was created at the settlement conference.  Under pressure, and given the already unfortunate circumstances surrounding Mr. Loomis' case, the Term Sheet was created with terms that never would have seen the light of day if the process had not been poisoned.

55.  For these reasons set forth above and for the reasons set forth in paragraph 48, this Court should deny the Motion.  *Seaboard Ice Co. v. Lee*, 199 Va. 243, 251 (1957) (contract will not be enforced unless it is "free from fraud, misrepresentation or mistake").

## D.  THE DOCTRINE OF EQUITABLE SUBORDINATION REQUIRES THIS COURT TO HEAR THIS MATTER

56.  The foregoing issues also invoke the doctrine of equitable subordination. Under that doctrine, this Court may reorder the claims of certain creditors who are found to have engaged in some form of inequitable conduct, thereby conferring a benefit on themselves. *Norton Bankruptcy Law And Practice,* §53.3, p. 53-8 *et. seq.* (3d ed 2008).

57.  Mr. Loomis alleges that sharp practices were employed to gain an unfair advantage.  Now Movants seek to enforce an agreement in a forum outside of this Court to better position themselves vis-à-vis other creditors.  Since this Court will need to hear any issues that may arise on equitable subordination, this is an additional reason supporting denial of the motion to lift stay.

2163106.1

58.  For the reasons set forth above and in paragraph 48, this Court should deny the Motion.

**E.  THE TERM SHEET WAS CONTINGENT ON THE TRANSFERABILITY OF CERTAIN PROPERTIES AND THOSE CONTINGENCIES FAILED**

59.  Under the Term Sheet, a confessed judgment note was supposed to be drafted and signed.  The Court can review this document and see that there are methods by which the obligation could be satisfied in whole or in part.  Mr. Loomis stated that this arrangement was contingent upon his brother's consent with respect to three of the assets in question.  Because his brother's retirement funds were tied up in those properties, his brother refused to cooperate and the conditions never came to pass.

60.  Local Counsel is prepared to testify that this contingency was published at the time the Term Sheet was being discussed.  Because this condition did not come to pass, the Term Sheet could never have matured into a binding obligation even if a formal agreement had not been required.

61.  Mr. Loomis' brother is subject to this Court's jurisdiction but not to the jurisdiction of the Virginia Court.

62.  For the reasons set forth above and in paragraph 48, this Court should deny the Motion.

**F.  DISCOVERY IS REQUIRED OF PERSONS IN THIS JURISDICTION**

63.  Discovery has closed in the Virginia Litigation.  It is not clear, given the feelings expressed toward Mr. Loomis and his Arizona Counsel by the Virginia Court,

2163106.1

whether he would be allowed to take discovery to support his claims and defenses set forth above.

64. Key witnesses, including Mr. Leberer, Jason Wood and Christopher Loomis, are only subject to compulsory process in Arizona.

65. This is another reason why this matter should be kept in this Honorable Court.

## CONCLUSION

66. This Court is entrusted with all matters pertaining to bankruptcy, and its specialized jurisdiction trumps all other considerations. There is a presumption that this matter should be heard in this Court, and there has not been a showing of "cause" that would justify requiring this case to be heard in Virginia. For all the foregoing reasons, therefore, Mr. Loomis respectfully requests that this Honorable Court deny the motion to lift stay and that it retain complete jurisdiction over all matters that concern Mr. Loomis and his estate.

Dated: March 5, 2010

Respectfully submitted,

/s/ Gerald K. Smith, AZ Bar No. 001428
40 North Central Avenue, Suite 1900
Phoenix, Arizona 85004
(602) 262-5348
(602) 734-3834 (Facsimile)
gerald@smithandsmithpllc.com
*Attorneys for Debtor*

/s/ Timothy J. McEvoy, VSB No. 33277
CAMERON MCEVOY, PLLC
11325 Random Hills Road, Suite 200
Fairfax, Virginia 22030
(703) 273-8898
(703) 273-8897 (Facsimile)
tmcevoy@cameronmcevoy.com
*Attorneys for Debtor*
*Pro Hac Vice Application Pending*

2163106.1

COPY of the foregoing
mailed March 5, 2010
to:

All parties in interest listed on
The master mailing list on file with
This Court.

s/ Kristin M. Reynolds
Kristin M. Reynolds

2163106.1